United States District Court
Southern District of Texas

**ENTERED**

March 06, 2017

David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

### GALVESTON DIVISION

| | | |
|---|---|---|
| ALMA ELIA SALAZAR, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-16-040 |
| | § | |
| | § | |
| CAROLYN W. COLVIN, | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMIN., | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Before the Court, upon referral from the District Court Judge, is a Motion for Summary Judgment filed by Defendant Carolyn W. Colvin, the Commissioner of the Social Security Administration. (Dkt. No. 12). The Motion pertains to Alma Elia Salazar's appeal of the denial of her applications for Social Security benefits. Plaintiff Alma Elia Salazar filed a response in opposition to the Motion (Dkt. No. 18), to which Defendant replied. (Dkt. No. 21). Having considered the Motion, along with the response and reply, the administrative record[1] and applicable law, the Court **RECOMMENDS**, for the reasons discussed herein, that the Defendant Commissioner's Motion be **GRANTED**, that the Commissioner's decision be upheld, and that Plaintiff's action be **DISMISSED**.

---

[1] The administrative record, which is over 800 pages, was filed electronically. (Dkt. No. 9).

1

## I. INTRODUCTION

Plaintiff Alma Elia Salazar (Salazar) brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration (Commissioner) denying her applications for disability benefits (DIB) and supplemental security income benefits (SSI). Salazar, without delineating her arguments, challenges the unfavorable decision. The Commissioner maintains that there is substantial evidence in the record to support the ALJ's decision and that the ALJ properly applied the relevant law.

## II. PROCEDURAL HISTORY

On February 12, 2014, Plaintiff Alma Elia Salazar (Salazar), who was approximately 43 years old, filed applications with the Social Security Administration (SSA), seeking disability insurance benefits (DIB) and supplemental security income (SSI). (Transcript (Tr.) 173-179; 180-185). In her application, Salazar alleged that her disability began on December 31, 2009, due to cirrhosis of the liver, schizoaffective disorder, fibromyalgia, and arthritis. (Tr. 173, 180, 199). Salazar's applications were denied initially and on reconsideration. (Tr. 109-116; 119-124). She appealed the denial and requested a hearing before an Administrative Law Judge (ALJ) to review the decision. (Tr. 102-103).

On September 26, 2015, a hearing was held before ALJ Susan J. Soddy in Houston, Texas. (Tr. 35-60). During the hearing, the ALJ heard testimony from Salazar, who was represented by counsel, and from a vocational expert (VE). (Tr. 35). Thereafter, on December 14, 2015, the ALJ issued a decision in which she concluded that Salazar was not disabled within the meaning of the SSA from December 31, 2009, through the date of the decision. (Tr. 30).

2

Salazar appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals, however, in a letter dated January 19, 2016, the Appeals Council notified Salazar that it declined to review the ALJ's determination. (Tr. 1-4). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Salazar, appearing *pro se*, filed a timely appeal of the ALJ's decision. 42 U.S.C. §405(g). The Commissioner filed a motion for summary judgment (Dkt. No. 12). The appeal is now ripe for consideration.

## III. STANDARD FOR REVIEW OF AGENCY DECISION

Judicial review of administrative decisions by the Commissioner are limited.[2] A federal court reviews the Commissioner's denial of benefits only to ascertain whether (1) the final decision is supported by substantial evidence and (2) the Commissioner used the proper legal standards to evaluate the evidence. *Brown v. Apfel*, 192 F.3d 472, 473 (5th Cir. 1999); *see also, Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir.1995) (a court is tasked with "scrutiniz[ing] the record to determine whether it contains substantial evidence to support the Commissioner's decision"). Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). When reviewing an administrative decision, the court is not permitted to re-weigh the

---

[2] Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.

evidence, try the issues *de novo* or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. *Johnson*, 864 F.2d at 343-44. Instead, conflicts in the evidence are for the Commissioner, not the court, to resolve. *Brown*, 192 F.3d at 496.

## IV. BURDEN OF PROOF

An individual claiming entitlement to DIB and/or SSI under the Act has the burden of proving her disability.[3] *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) (2000). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3) (2000). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 423(d)(2)(A) (2000). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992)(quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

---

[3] An income cap also exists for SSI benefits, but that is not relevant in the case at hand.

4

The law requires the Commissioner to determine whether the claimant has a disability. *See*

*Heckler v. Campbell*, 461 U.S. 458 (1983). The Commissioner utilizes a five-step sequential

evaluation analysis to aid in determining whether a claimant is disabled. *Villa v. Sullivan*, 895

F.2d 1019, 1022 (5th Cir. 1990). The five steps are as follows:

> 1. If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of impairments, [s]he will not be found disabled;
>
> 3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration [her] age, education, past work experience, and residual functional capacity, [s]he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett*, 67 F.3d at 563 n.2; *Wren v. Sullivan*, 925 F.2d 123,

125 (5th Cir. 1991).[4]

The claimant bears the burden of proof at the first four steps of the sequential analysis.

*Leggett*, 67 F.3d at 564. Once the claimant has shown that she is unable to perform her previous

work, the burden shifts to the Commissioner to show that there is other substantial gainful

employment available that the claimant is not only physically able to perform, but also, taking into

---

[4] Notably, in conjunction with steps four and five determinations, the Commissioner utilizes a residual functional capacity assessment. Residual functional capacity is defined as "what you can still do despite your limitations." 20 C.F.R. §§ 404.416.945 (2012). It has three components: physical abilities, mental abilities, and other abilities affected by impairments. *Id.* Additionally, when a mental impairment is involved, the five-step analysis is supplemented by additional procedures referred to as the "special technique." 20 C.F.R. §§ 404.1520a, 416.920a (setting forth the "special technique" used to assess mental impairments).

account her exertional and nonexertional limitations, able to maintain for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir.2002). If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that he or she is unable to perform the alternative work. *Anderson v. Sullivan*, 887 F.2d 630, 632–33 (5th Cir.1989).

In the instant case, the ALJ proceeded through all five steps of the sequential process. The ALJ found at step one that Salazar had not engaged in substantial gainful activity since December 31, 2009, the alleged onset date. At step two, the ALJ found that Salazar's obesity, fibromyalgia, chronic pain syndrome, cirrhosis of the liver and schizoaffective disorder were all severe impairments. At step three, the ALJ concluded that Salazar did not have an impairment or combination of impairments that met or medically equaled a listed impairment, including Listings 1.02, 5.05, 11.04, and 12.04. The ALJ then, prior to consideration of step four, determined that Salazar had the residual functional capacity (RFC) to perform light work which was limited by the following: no climbing of ropes, ladders, or scaffolds; and only simple, routine tasks that do not require more than occasional interaction with the public. (Tr. 16-28). At step four, the ALJ determined that Salazar was unable to perform any past relevant work. At step five, considering Salazar's age, education, work experience, RFC, and the testimony of a vocation expert (VE), the ALJ concluded that Salazar could perform jobs such as an office helper, a housekeeping cleaner or a mail clerk, and that she was, therefore, not disabled as defined in the Social Security Act, from December 31, 2009, through the date of the ALJ's decision. (Tr. 10-30).

## V. DISCUSSION

The Court reviews this *pro se* appeal to determine whether the Commissioner's decision

6

adheres to the protocol established by the SSA, the Commissioner's own regulations and internal policies articulated in Social Security Rulings, and whether the Commissioner's critical fact findings were made in compliance with applicable law. *See Elam v. Barnhart*, 386 F.Supp.2d 746, 752-53 (E.D.Tex. 2005) (setting forth an analytical framework for judicial review of *pro se* actions challenging an administrative determination that is aimed at striking "a fair balance" between the parties).

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126. Any conflicts in the evidence are to be resolved by the ALJ and not the Court. *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citing *Brown*, 192 F.3d at 496).

## A. Objective Medical Evidence

The Court begins its inquiry by considering the objective medical evidence. Salazar's medical records, which were considered by the Commissioner and are part of the administrative record, show that she has been seen and treated for chronic pain syndrome, fibromyalgia, cirrhosis of the liver, schizoaffective disorder and obesity.

The medical records show that in early December of 2012, Salazar was seen in the emergency room (ER) at UTMB due to complaints of left flank pain and nausea. (Tr. 270-273). Upon examination, the doctor noted that Salazar was in mild distress accompanied by some tenderness in her left flank and lab work revealed elevated liver enzymes. (Tr. 272, 421; 388-

7

389). Salazar was discharged from the ER the same day with a diagnosis of renal colic, renal lithisis and transaminitis and she was instructed to follow-up with her doctor. (Tr. 273).

Approximately six months later, Salazar saw her primary care doctor. During the May 6, 2013 visit, she complained of chronic back and generalized body pain, but was not taking any medication to alleviate the pain. (Tr. 277-279). The doctor noted that Salazar had an antalgic gait, tenderness in her lumbar region and all extremities, as well as a painful range of motion (ROM) in all her joints. (Tr. 278). Imaging of Salazar's lumbar spine was largely unremarkable (Tr. 386-387) and lab work showed elevated liver enzymes. (Tr. 280-282). Salazar was assessed as having chronic pain syndrome and she was prescribed Zoloft for her depressed mood. (Tr. 282).

During a follow-up visit with her primary care doctor on June 12, 2013, Salazar complained that the Zoloft was not helping, that she was experiencing insomnia, low energy, poor appetite, difficulty concentrating, and "fleeting thoughts of being better off dead." (Tr. 287-289). A physical examination revealed that Salazar had normal ROM, no spasms, no joint effusions and no swelling or deformities. The doctor performed a mental examination and found Salazar possessed normal judgment, cognition and memory; she was not delusional; her speech was delayed, but it was not rapid, pressured or tangential; she was not anxious, but exhibited a depressed mood and was slow and withdrawn; her affect was not labile; and, while she expressed suicidal ideation (SI), she had no plan. (Tr. 289). Salazar was assessed as having chronic pain syndrome, for which she was given an injection of Toradol; depression, for which she was prescribed Celexa; and she was referred to the psychiatry department for further evaluation. The doctor also opined that Salazar was able to concentrate enough to go to work. (*Id.*).

8

In early July of 2013, Salazar was seen at UTMB's Gastroenterology (GI) Clinic for evaluation. (Tr. 290-292). Upon examination, Salazar was in no apparent distress, fully oriented, obese with some tenderness in her abdomen, but otherwise her exam was normal. The results of an upper GI endoscopy showed Salazar had an ulcer, along with multiple superficial ulcers and erosions in her stomach and she was started on Prilosec. (Tr. 296-299; 368-370).

On July 8, 2013, Salazar was seen for a follow-up visit with her regular doctor. (Tr. 293-296). According to the notes, Salazar began taking Celexa three weeks ago and she reported that she was not experiencing SI or homicidal ideation (HI), but she had trouble concentrating and her energy was low; that she experienced generalized pain in her hands; and that the pain in her shoulders and hips had improved with the medication, but that she discontinued taking it because she feared it would damage her liver. The doctor's notes reflect that Salazar was well groomed and pleasant; her mood, affect and behavior were normal; and there was no evidence of SI or HI. In addition, she was found to have normal ROM in her neck and, despite swelling in her hands and some discomfort with abduction of her arms, she had normal strength and no sensory deficits. She was assessed with polyarthralgia and depression, which was severe, but stable. (*Id.*).

On July 31, 2013, Salazar was seen for initial evaluation in UTMB's Psychiatry Department. (Tr. 300-304). The notes from the mental status exam reflected the following: Salazar was casually dressed; she exhibited poor eye contact; her gait and station were stable, but she shuffled at times; her mood appeared depressed, she was irritable and uncooperative at times; she had normal psychomotor; her speech was clear and coherent; her thought process was grossly logical and goal directed, but her judgment was suspect; she endorsed auditory hallucinations (AH), but there was no indication of SI or HI. Utilizing a multi-axis approach, the psychiatrist

9

noted his preliminary diagnosis of Salazar as follows:

> Axis I – Schizoaffective disorder
>
> Axis II – none
>
> Axis III – elevated liver enzymes, chronic pain syndrome, vitamin D deficiency; thrombocytopenia and depression
>
> Axis IV – financial, health and health care services and primary support/family
>
> Axis V – GAF 60 with moderate symptoms and moderate difficulty in social and/or school functioning.

(Tr. 304). The doctor started Salazar on Risperdal, increased her dosage of Celexa and instructed her to return in three weeks for follow-up care.

Approximately one week later, Salazar saw her regular doctor for a routine follow-up visit. (Tr. 305). During the visit, Salazar complained of myalgia and chronic pain and explained that she had begun taking Risperdal, but she doubled the dosage prescribed because she felt it would help her sleep. (*Id.*). The doctor noted that Salazar's mood appeared to be depressed, she exhibited joint tenderness and soreness in her extremities, and the doctor counseled Salazar to take her medications only as prescribed.

On August 21, 2013, Salazar returned to see the psychiatrist and complained that she had experienced no improvement in the AH (*i.e.*, "loud", intrusive "laughing"); and she continued to experience poor sleep, anhedonia, poor energy, and irritability. (Tr. 306-308). Salazar also complained that since starting Risperdal, she started to feel an intermittent "twitching" in her hands, but she could not describe the frequency and answered in a conflicting manner when asked if it was voluntary or involuntary. During this visit, Salazar was observed to be casually dressed,

10

exhibited good eye contact, was cooperative and that her gait and station were stable. The doctor examined Salazar and found her mood appeared to be depressed; she exhibited no abnormal psychomotor movements; her affect was congruent; her speech was clear and coherent; her thought process was grossly logical and goal directed; her thought content reflected no delusions; her perceptual content was positive for AH ("laughing"); she was fully oriented; she exhibited normal cognition, her memory was intact; her judgment was grossly intact; her reasoning was normal; her insight was limited; her intelligence below average to average; and there was no evidence of SI or HI. (Tr. 307). While his assessment remained unchanged, the doctor instructed Salazar to slowly increase her dosage of Risperdal, counseled her to only take her medications as prescribed and, due to her complaints of hand twitching, started her on Cogentin.

On August 27, 2013, Salazar returned to the GI Clinic for a follow-up visit and reported that with the medication, overall, she was feeling better and only experiencing mild epigastric discomfort, no hematemsis, melena or vomiting. (Tr. 309-311). Lab work was done and showed, despite undergoing two weeks of treatment, that Salazar still tested positive for H pylori and was instructed to undergo an additional round of treatment.

On September 18, 2013, Salazar returned to see the psychiatrist. (Tr. 312-316). During this visit, Salazar denied experiencing any side effects from the medications and reiterated that she was not experiencing VH, but that she did not feel like the Risperdal was helping with the AH. Due to Salazar's lack of cooperation and irritable mood, a full mental status exam could not be performed; however, the doctor's notes reflect that she was casually dressed and had good eye contact; her gait and station were stable; she had a resting tremor bilaterally in her upper extremities; her attitude was guarded at times; her mood was depressed; her affect irritable; her

11

speech was clear and coherent; her thought process was illogical at times; no delusions were elicited; she reported auditory hallucinations which she described as "laughing"; she refused to answer questions regarding cognition; she was not oriented to place or time; her memory was intact; she was below average intelligence; her judgment suspect; her insight limited; and she was negative for either SI or HI. The doctor's assessment remained unchanged and he instructed Salazar to increase her dosage of Risperdal, continue taking the Cogentin and to return in three weeks for follow-up care. (Tr. 316).

On September 20, 2013, Salazar was seen by a specialist at UTMB due to her continued complaints of polyarthralgias. (Tr. 317-322). The doctor's notes from the examination reflect that Salazar was 4'10" and weighed 190 pounds; she was alert and fully oriented; she had a full range of motion in her neck and cervical spine; she claimed an inability to walk on the tip of her toes and heels; there was no swelling in her shoulder and elbows, but it was noted to be tender with a limited ROM; there was no synovitis present in her hands and fingers, yet she demonstrated poor grip strength, decreased fist-making ability and limited ROM; she had decreased range of motion in her wrist; she expressed tenderness in her lower extremities, but her ROM was normal and no peripheral edema was present. The lab work was positive for H Pylori. The doctor's initial assessment was that Salazar might have fibromyalgia. He ordered a sleep study, referred Salazar to physical therapy for evaluation and prescribed a low dose of Lyrica and Flexeril for the pain. The doctor also instructed Salazar to follow-up with her doctor based on her report that her depression was not well controlled and that she was off "any medications." (*Id.*).

One week later, Salazar was seen by her doctor and the notes reflect that she complained of feeling nauseous, but reported that her depression was stable on medication and that her mental

12

health was improving. (Tr. 323-324). Salazar was instructed to continue taking her medications as prescribed and it was explained to her that the nausea was likely due to the recent liver biopsy.

In early October 2013, Salazar attended a physical therapy session as instructed by her specialist. (Tr. 325-328). The notes from the initial session document that Salazar was observed walking into the clinic with one foot in front of the other in no apparent pain. (Tr. 327). Nevertheless, Salazar reported that, despite taking Lyrica and Flexeril, she still experienced pain all over her body that she rated as a 10/10, and that she was in so much pain that she could not sit or participate in the session. (Tr. 326). While undergoing no therapy, Salazar was later observed walking out of the clinic exhibiting a gross limp in her gait and wincing in pain. (Tr. 327).

Salazar returned to see her primary care doctor on October 8, 2013, for routine follow-up. (Tr. 332-334). According to the notes, Salazar had previously been ordered to undergo a quadruple therapy to eradicate the fecal H pylori infection; however, she discontinued the prescribed treatment after 4-5 days because she experienced nausea. Salazar also reported that her abdominal pain had improved and that she only experienced mild epigastric discomfort. (Tr. 332). A physical examination was performed and the findings were essentially normal. Insofar as Salazar failed to follow the prescribed treatment protocol, the doctor ordered additional fecal testing at her next visit and advised her that she would benefit from weight loss. (Tr. 334).

The next day Salazar attended her second physical therapy appointment. (Tr. 329-331). During this session, Salazar reported that she was having a better day with less pain (5/10), but claimed that she still experienced pain in her entire body. While acknowledging that Salazar exhibited significant weakness and deconditioning, the therapist's notes reflect that Salazar was

13

observed walking into the clinic with an antalgic gait and decreased weight on the lower left extremity, but after the session, when she claimed her pain had increased to 8/10, she was observed walking to her car with increased speed of gain, continued mild limp, but no wincing in pain. (Tr. 330-331).

On October 16, 2013, the psychiatrist saw Salazar, who was accompanied by her son, for a follow-up visit. (Tr. 335-337). Salazar reported that the tremor in her hands was improving on the Cogentin. She also reported that she had experienced mild improvement in terms of decreased frequency and severity in the AH over the last three weeks, but complained that her symptoms were worse today. Salazar conceded, however, that she had not been taking the prescribed dosage of the Risperdal and stated that she was having a problem getting the pharmacy to provide the prescribed dosage. The psychiatrist's notes reflect that Salazar appeared casually dressed, exhibited good eye contact, was cooperative and that she interacted well with her son throughout the exam. Upon examination, Salazar was noted as having a stable gait and station; no tremor was present; normal psychomotor movements; mood depressed; affect congruent; speech clear and coherent; thought process was grossly logical and goal directed; no delusions elicited on exam; denied AH and VH during exam, but stated that they occur daily (voices and "shadows"); normal cognition; fully oriented; grossly intact memory; below average intelligence; judgment suspect; limited insight; no SI/HI; reasoning reflects the inability to explain proverbs. Salazar's psychiatric assessment remained the same. (Tr. 337). The doctor reiterated to Salazar that she needed to take the increased dosage of Risperdal as prescribed and instructed her to advise the clinic if she encountered problems filling her medications. (Tr. 336).

Two weeks later, Salazar saw her regular doctor and complained of chronic pain. (Tr.

14

340-342). Upon examination, the doctor found Salazar had multiple tender points all over her body with no evidence of edema; her affect was blunt; and she exhibited delayed speech and appeared tired. The doctor documented concerns of non-compliance and instructed Salazar to bring all her medications with her to her next visit. (Tr. 341).

Salazar returned to see her doctor twice in November (Tr. 343, 371-376, 346-348) and, during the visits, endorsed continued, generalized body aches and pain (Tr. 346-348), reported feeling depressed and acknowledged that she had stopped taking all her medications. (Tr. 343). The notes from the physical exam in early November reflected that Salazar's exam was "normal" with no evidence of edema. (Tr. 344). In addition, an abdominal ultrasound showed that her liver was normal in size and shape (Tr. 378); and a sleep study showed mild obstructive sleep apnea with history of mood disorder. (Tr. 371-376). Similarly, the notes from the physical exam performed later in November reflected that Salazar was found to have normal proximal and distal muscle strength; normal gait; she was able to rise from a seated position unassisted; her reflexes were symmetric; she had tender points present in different areas without joint swelling, warmth or tenderness; and she had a full ROM of motion in her all her joints. (Tr. 347-348).

In mid-December 2013, Salazar presented at the ER with complaints of severe, generalized pain that had lasted several days. (Tr 349-353). The notes from the examination reflect that Salazar was alert and anxious; she was cooperative and interactive; her mood/affect was normal; her neck and back were non-tender with a painless ROM; her extremities were found to be "atraumatic" with a normal ROM; and her gait was normal and her pelvis was stable. (Tr. 351). The doctor diagnosed Salazar with acute exacerbation of chronic pain and liver disease and, after being given parenteral analgesics, he discharged her with prescription for hydrocodone.

15

On January 10, 2014, Salazar returned to see the psychiatrist for a follow-up visit. (Tr. 354-355). Salazar, who was noted to be casually dressed and cooperative, reported that she did not believe the Risperdal was helping because she still heard voices and continued to experience depression due to her chronic pain. (Tr. 354). Salazar also reported that she had been vomiting blood (both red and brown) over the past two weeks, so she discontinued taking all her medications. The psychiatrist performed an examination and found that Salazar's mood was depressed; her affect was blunt; she endorsed AH ("loud voices"); and there was no evidence of SI or HI. The psychiatrist attributed the increase in Salazar's symptoms to her non-compliance with her prescription medications; he stressed to Salazar the importance of taking her medication; he agreed to start her on a different anti-psychotic medication (Latuda) based on her claims that the Risperdal was not effective; and he instructed her to return in a month for follow-up. (Tr. 358)

On February 7, 2014, Salazar returned to UTMB where she was seen for follow-up visits with both her regular doctor and her psychiatrist. (Tr. 359-363; 521-522; 523-528). During these visits, Salazar reported that since starting Latuda one month ago she had noticed a decrease in severity and frequency of the AH and that the VH were less intrusive; that she only experienced "occasional depression;" and that she continued to experience fibromyalgia pain in her hips and feet, however, she acknowledged that she had not yet begun taking the increased dosage of Lyrica (*i.e.*, from 25 to 75mg) that she was prescribed. According to the notes, the physical examination was normal, with no distress apparent and no evidence of edema. (Tr. 359). The notes from the mental health examination were largely similar to prior examinations with some minor exceptions. In particular, the doctor's notes reflect that Salazar appeared casually dressed; she was

16

cooperative; her gait and station were slow, but stable; she exhibited normal psychomotor movements; her mood was depressed; her affect was congruent; her speech was clear and coherent; she possessed a grossly logical thought process and was goal direct; she endorsed paranoid thoughts, as well as AH and VH (*i.e.*, hearing voices and seeing shadows), but no SI or HI. (Tr. 362). Salazar was directed to take all her medications as prescribed. (Tr. 363).

In mid-February 2014, Salazar returned for a follow-up appointment in the GI Clinic. (Tr. 364-366). During the visit, Salazar denied experiencing any abdominal swelling, stool change, vomiting, blood loss or significant weight changes; however, she complained of musculoskeletal pain in her lower back, wrists and hands. Upon examination, Salazar, who was alert and fully oriented, was found to exhibit mild distress with antalgic gait on ambulation; there was mild tenderness upon deep palpitation of her abdomen; and, otherwise, her exam was normal, with no evidence of clubbing, cynosis or edema (c/c/e) in her extremities.

Salazar returned to see the psychiatrist on March 10, 2014, for a follow-up visit. (Tr. 529-531). According to the doctor's notes, Salazar claimed not to recognize him during more than half the interview. In addition, Salazar reported that she experienced severe pain and swelling in all her extremities; that she felt like her AH and VH had worsened over the past two weeks; and, while denying that she experienced any side effects for this or any other medication, she acknowledged that she had not yet increased the dosage of Latuda as she had been directed and attributed the blame to the pharmacy. (Tr. 529-531). Salazar's mental status exam was largely consistent with her prior exams. (Tr. 530). The doctor instructed Salazar to begin taking the increased dosage of Latuda, to continue taking Lyrica and to follow-up with her regular doctor regarding her complaints of increased swelling and pain in her extremities because it was likely

17

that her liver disease was a major contributor. (Tr. 531).

On April 23, 2014, Salazar was admitted to Houston Methodist Hospital because she was experiencing AH, accompanied by concerns of SI. (Tr. 545-569; 586-613). Upon examination, Salazar's physical exam was noted to be essentially normal with no joint redness, no edema, and no c/c/e in her extremities (Tr. 549); and, when assessing her mental health, the examiner noted that Salazar's reported history was inconsistent with her symptoms regarding the timeline and discrepancies were noted between what was reported and what was observed by multiple members of the psychiatric unit. Ultimately, the doctor restarted Salazar on psychiatric medications (Tr. 546), after which her condition improved considerably, and she was discharged on April 25, 2014. (Tr. 547).

Salazar was next seen on July 14, 2014. (Tr. 655-665). During this visit, she was examined by her regular doctor who found that she had tenderness upon palpation over pressure points on her back, but no evidence of c/c/e in her extremities; and that she appeared anxious and confused, yet she was fully oriented and she had a tangential thought content and process. (Tr. 658). The doctor also documented that Salazar had not been compliant in taking the correct dosage of the prescription medication used to control her fibromyalgia (Tr. 656) and that she had stopped taking the anti-psychotic medication several weeks ago despite the fact that it was proving effective in diminishing the frequency and severity of her hallucinations. The doctor, therefore, counseled Salazar of the importance of taking the medications as directed. (Tr. 656).

On July 25, 2014, Salazar returned to UTMB to see a psychiatrist and reported that she had been off her medication for the past three weeks, which she stated was due to problems with Medicaid, and approximately one week after she stopped taking her medications, she began to feel

18

very depressed and she started having AH. (Tr. 666-673). In addition, she now reports that she has issues with insomnia, low energy, poor concentration, loss of interests and thoughts of hurting herself. (Tr. 667). Salazar was examined the following were found: a depressed mood, blunt affect, soft speech; confusion with a slowed thought process, but normal associations; positive for AH and SI, but no HI; severely impaired judgment; fair insight, average intelligence; below average fund of knowledge; intact recent and remote memory; poor attention and concentration. (Tr. 668). Due to the fact that Salazar had been noncompliant with her medications and was reporting worsening symptoms of AH accompanied by SI, the psychiatrist determined that the best course of action was to admit Salazar to the hospital for inpatient treatment. (Tr. 668).

Salazar was admitted to Houston Methodist Hospital on July 26, 2014. (Tr. 614-653). Upon examination, Salazar was found to be alert, oriented x3 (not to time), she had pain/swelling in her hand joints, diffuse pain throughout body but especially in her small and large joints, but no c/c/e. The doctor also documented that her presentment was similar to her visit there in late April. (Tr. 616). The doctor re-started Salazar on medications, her condition improved, and she was discharged on July 26, 2014, with instructions to continue taking her medications. (Tr. 645-647, 653)

After being discharged from the hospital, Salazar saw her regular doctor for follow-up care. (Tr. 674-682). During the August 1, 2014 appointment, Salazar reported that her pain was well controlled (*i.e.*, 0/10) despite the fact that she was not currently taking any medications.[5] (Tr. 674). Following an examination, the doctor assessed Salazar as having chronic pain

---

[5] Salazar attributed the lapse in taking her medications to insurance and the pharmacy. (Tr. 674).

19

syndrome, but that her pain was currently resolved; she had no hallucinations; and there was no

evidence of SI or HI. The doctor also noted that, despite Salazar's reports of insurance problems,

he personally verified with staff that her insurance was active and he instructed Salazar to continue

taking her current psychiatric medications and the Neurontin for pain control. (Tr. 675).

When Salazar returned to see the psychiatrist at UTMB on August 18, 2014, she reported

that she had not taken her medications for the past two weeks and, as a result, the AH had

increased and the voices were telling her to kill herself. (Tr. 612-613). Based on the increase in

her psychosis, the doctor decided to admit Salazar to the hospital. However, documented within

the notes are comments that inconsistencies existed in Salazar's reports and "[t]here is a question

of malingering." (*Id.*). After being admitted to the hospital, Salazar was restarted on her

medications, her condition improved and she was discharged home in stable condition. (Tr. 613).

Salazar was next seen by her primary care doctor for a follow-up visit on September 12,

2014. During this visit, Salazar reported that she had severe (*i.e.*, 10/10) pain "everywhere." (Tr.

683-694). Salazar acknowledged that she had been taking Gabapentin, but not Tramadol. Upon

examination, Salazar was found to have areas of tenderness to light palpation and limitations in

her ROM. The doctor assessed Salazar as having chronic pain and schizoaffective disorder; he

ordered an injection of Tramadol for the pain; instructed her to continue taking all of her

medications; and documented that he had some suspicions concerning her complaints of

exacerbation of pain and psychoactive symptoms. (Tr. 684). Salazar saw the psychiatrist two

weeks later and was instructed to increase her dosage of Latuda and Cymbalta. (Tr. 697-700).

On January 4, 2015, Salazar was admitted to the hospital due to complaints of abdominal

pain, accompanied by vomiting. (Tr. 718-719; 799-806). Salazar reported that she stopped

taking her medications when she started vomiting. (Tr. 801). The CT of Salazar's abdomen showed a normal appendix and anatomical changes of cirrhosis and portal hypertention as suggested by portal vein prominence and mild splenomegaly without evidence of ascites. Salazar was restarted on medications, which prompted improvement, and she was later discharged.

On January 9, 2015, Salazar returned to see her psychiatrist and explained that since her last appointment she was doing better (*i.e.*, no AH or VH and less paranoia), that she was taking her medication as prescribed and that she was not experiencing any side effects from the medications. (Tr. 795-798). Despite the reported improvements, Salazar claimed that she was now experiencing abdominal pain and an increase in paranoia around people. (Tr. 795-798). The doctor's notes reflect Salazar appeared at the appointment casually dressed and she was cooperative. A physical exam was performed and the findings reflect the following: a stable, albeit slowed, gait and station; a depressed mood and restricted affect, however, she brightened up significantly when talking about her son; illogical thoughts were occasionally exhibited (*i.e.*, trolls and demons); normal cognition was present without gross disturbances; fully oriented; good attention and concentration; suspect judgment, but improved since the last visit; and fair insight. (Tr. 797). The doctor's notes reflect that Salazar appeared to be doing well since he started her on Seroquel, but since she had recently experienced worsening paranoia and VH, he placed her on an increased dosage of Seroquel and added Cognetin. (Tr. 797-798).

On January 14, 2015, Salazar was seen by her primary care doctor due to complaints of headache, pain and shortness of breath. (Tr. 792-794). Upon physical examination, Salazar was found to have normal range of motion musculoskeletally with no rigidity, but pain on palpation over all trigger points; normal reflexes; her mood was anxious and her affect blunt; speech delayed

21

and she exhibits a depressed mood. (Tr. 794). The doctor assessed Salazar with schizoaffective disorder, depressive type; he noted that Salazar was not taking her anti-psychotic medications because she claimed that she was having difficulty obtaining them; and he observed that Salazar was actively psychotic. While Salazar waited at the clinic, her doctor called the pharmacy, ensured the prescriptions were submitted and filled and then directed Salazar to go pick-up her prescription medications. The doctor also instructed Salazar to resume taking all her medications and to follow-up with him in two weeks. (Tr. 794).

Approximately two weeks later, Salazar returned to see her primary care doctor and reported that she was experiencing AH and VH. (Tr. 770-791). The doctor's notes reflect that Salazar's affect was flat, she was oriented in person only, and hearing voices. (Tr. 779). The doctor's notes also reflect that Salazar was not compliant in taking her medications as prescribed. (Tr. 789). During the visit, Salazar became agitated with psychosis and was attempting to hurt herself by banging her head against wall. Due to her conduct, Salazar was transported to the ER and then transferred to St. Joseph's inpatient psychiatric facility where she was treated (*i.e.*, she was restarted on her medications) and released on February 5, 2015. (Tr. 770, 776).

After being released from the inpatient facility, Salazar saw her psychiatrist on February 13, 2015, for a follow-up visit. (Tr. 767-770). Salazar was examined and, with the exception of a positive response for pain musculoskeletally, her physical examination was normal. (Tr. 768-769). A mental status exam was performed and the doctor documented his observations and findings as follows: Salazar was casually dressed; her gait and station were normal; her mood was anxious or happy depending on the part of the interview; her affect was bizarre; her language was childlike at times; she had paranoid/bizarre delusions; her cognition was impaired; she was fully

22

oriented; while she exhibited poor memory of her recent hospitalization, her recent and remote memory was otherwise normal; she possessed a below average fund of knowledge; her attention and concentration were fair; her judgment was highly suspect; and her insight was poor. (Tr. 769). While her psychiatrist considered Salazar's behavior bizarre at times, he determined that it did not meet the criteria for inpatient admission; he started Salazar on Invega to better address her mental health issue (*i.e.*, schizoaffective disorder, insomnia and social anxiety disorder) and he instructed Salazar to continue taking Latuda. (Tr. 770).

On April 15, 2015, Salazar returned to see her primary care doctor and reported that she had been started on Invega, which was controlling her AH and diminishing her VH, and she denied experiencing depression or SI. (Tr. 764-766). Upon examination, Salazar was found to be oriented x3; she had a normal reflexes and normal ROM in her neck, back and extremities; her mood and affect were normal; and her behavior, judgment and thought content were all normal. A CT scan of her abdomen was performed and showed anatomic changes of liver cirrhosis with portal hyptertention evidence by splenomegaly and portosystemic shunting, but there was no evidence of ascites. (Tr. 712-713). Salazar was instructed to continue on her current treatment since she was responding well and the medications were controlling her symptoms. (Tr. 766).

On May 2, 2015, Salazar returned to see her primary care doctor. (Tr. 746-747). The notes from the visit reflect that Salazar was not taking her medications because she ran out at the end of March and explained that was unable to get refills. (Tr. 746-747). Upon examination, Salazar was observed to be in no apparent distress; her affect was good, with clear mentation and no asterixis; she was ambulating without assistance; her skin and abdomen were tender to light palpation, but there was no evidence of palmer erythema or c/c/e in her extremities. The doctor

23

ensured Salazar's prescriptions were available to her and instructed her to resume taking her medications. (Tr. 747).

Approximately one week later, Salazar was accompanied by her son when she saw her psychiatrist on May 8, 2015, and reported that she had been unable to obtain her medication for the last month due to insurance issues. (Tr. 743-746). Salazar also reported that she had been hearing "command hallucinations" that compelled her to engage in self-harming behavior (*i.e.*, hitting her head against the wall); that she was experiencing paranoia; and that she became anxious in public. The doctor observed that Salazar was very kind to her son and appeared to show him the appropriate amount of love and compassion. Upon examination, the doctor found Salazar to be cooperative, but her mood was depressed and her affect restricted; she fully oriented; she possessed a mostly logical thought process; her concentration was fair; her judgment was suspect; and her insight was poor, but improving. (Tr. 745). The psychiatrist commented that while Salazar appeared to be expressing symptoms consistent with psychosis (*e.g.*, AH, VH and paranoia), her symptoms were "odd and not entirely consistent with schizoaffective disorder." (*Id.*). After verifying with the pharmacy that there would be no problems filling her prescriptions, the doctor instructed Salazar to take her medications as prescribed and to bring all her prescription bottles to her next appointment so he could assess her compliance. (Tr. 745-746).

On May 17, 2015, Salazar was hospitalized due to complaints of swelling, shortness of breath and for generalized pain and abdominal pain. (Tr. 706-709; 754-763). Diagnostic tests were preformed, but revealed no findings consistent with Salazar's complaints of abdominal pain or her shortness in breath. (Tr. 740-742, 758-759). The notes, however, reflected that Salazar had been off "ALL medications" since March. (*Id.*). The doctor instructed Salazar to resume

24

taking all her medications, ordered an IV with Lasix for the fluid overload and, when her condition improved and she was stable, she was discharged with instructions to comply with her medications. (Tr. 759).

On June 5, 2015, Salazar was seen by her psychiatrist for follow-up visit. (Tr. 731-734). During this visit Salazar stated that she restarted taking her psychiatric medications about four days ago because, after being off her medications for over a week, she noticed that the AH were getting louder and were accompanied by VH. Upon examination, Salazar was physically found to have normal ROM, no rigidity, normal reflexes and some pain on palpation over all trigger points; and mentally she was found to be alert, her mood was anxious and depressed, her affect was blunt and her speech was slow and delayed. The doctor noted that Salazar's worsening symptoms of AH/VH were likely due to her medical noncompliance and he instructed Salazar to continue taking her medications as prescribed.

Three days later, Salazar saw her primary care doctor and reported that she had been compliant with all her medications and that her psychiatric medications were working effectively to control and/or diminish the AH. (Tr. 728-730). Nonetheless, Salazar complained of recent weight gain, lower extremity swelling, abdominal swelling and pain which she rated as an 8/10. Upon examination, Salazar was found to be fully oriented; she was not acutely psychotic or confused; her abdomen was distended and tender upon palpation; her lower extremities exhibited bilateral pitting edema up to her knees; and there was tenderness in her legs upon palpation. The doctor assessed Salazar with fluid overload, which he commented was "likely secondary to cirrhotic decompensation," and noted that her mental health symptoms were appropriately controlled with the medications and the voices, while still reportedly present, were manageable.

(Tr. 735).

On June 8, 2015, Salazar was admitted to the hospital due to her reports of excruciating pain all over her body and swelling of her abdomen. (Tr. 748-751). The results from diagnostic tests proved unremarkable – showing no evidence of decompensation of her cirrhosis or the existence of ascites. The doctor prescribed an IV with Lasix swelling and with Toradol for the pain and, when her condition stabilized, Salazar was discharged with instructions to follow-up with her primary care doctor.

On July 1, 2015, Salazar saw her doctor to obtain refills of Tramadol and to obtain a letter to support her claim for social security benefits. (Tr. 725-727). According to the notes, Salazar reported that she was experiencing pain in her hands and feet, which she rated as 7/10, and she stated that Tramadol helped a little. The doctor examined Salazar and found that she was alert; she had normal pulses, reflexes and ROM; no rigidity was present; she endorsed pain on palpation over all trigger points and upon movement; and she exhibited puffiness in her hands and feet. The doctor also noted that Salazar's cognition and memory were normal, however, her mood appeared anxious and depressed, her affect was blunt, and her speech was slow and delayed. The doctor assessed Salazar with chronic pain syndrome, prescribed Tramadol and ordered additional testing to rule out autoimmune causes.

The Court has considered the ALJ's findings against the backdrop of this evidence and finds that the ALJ adhered to the correct legal standards and that substantial evidence exists in the record that supports the ALJ's determinations at steps two and three (*see* 20 C.F.R. §§ 404.1520, 404.1520a, 404.1525, 404.1526, 404.1528, 416.920, 416.920a, 416.925, 416.926, 416.928), as well as the ALJ's assessment of her residual function capacity. *See* 20 C.F.R. §§ 404.1545.

26

404.1546, 416.945. 416.946. This factor weighs in favor of the ALJ's decision. (Tr. 13-16).

## B. Diagnoses and Expert Opinions

The second element considered is the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir.1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir.1981). Indeed, "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." *Newton*, 209 F.3d at 455 (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir.1995)). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (quoting *Bradley v., Bowen*, 809 F.2d 1054, 1057 (5th Cir.1987)). Further, regardless of the opinions and diagnosis of medical sources, " 'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990).

In the present case, the administrative record contains a series of opinions from several of Salazar's treating doctors that take the form of "To Whom It May Concern" letters. (Tr. 696, 710, 711, 722, 720). Although offered by different medical providers, the opinions expressed in

the letters are the same – namely, that Salazar's ability to function outside of her home is limited
(Tr. 696, 720, 722) or that she is unable to work. (Tr. 710, 711). A review of the administrative
decision, clearly reflects that the ALJ considered the opinions contained in these letters. (Tr. 28).
In addition, to the extent urged, the ALJ did not err in failing to give these opinions controlling
weight. The law is clear that, regardless of the opinions and diagnoses of medical sources, the
"sole responsibility for determining a claimant's disability status" rests with the ALJ. *Martinez*,
64 F.3d at 176.

Moreover, the ALJ is "free to reject the opinion of any physician when the evidence
supports a contrary conclusion." *Martinez*, 64 F.3d at 176. As properly discussed by the ALJ,
the opinions expressed in the letters were not consistent with the objective medical evidence (Tr.
287-289; 290-292; 293-296; 304; 309-311; 325-328; 332-334; 329-331; 335-337; 347-348; 351;
359; 364-366; 378; 371-376; 545-569; 586-613; 674; 712-713; 718-719; 725-727; 728-730; 731-
734; 740-742; 747; 748-751; 758-759; 764-766; 794; 795-798; 799-806) or the other medical
opinions contained in the record from consultative examiners Dr. Bolte (Tr. 570-577) and Dr.
Keiser (Tr. 537-543; 701-705). This Court concludes this factor also supports the ALJ's decision.

## C. Subjective Complaints

The next element to be weighed is the subjective evidence of pain. It is well-established
that not all pain is disabling, and the fact that a claimant cannot work without some pain or
discomfort will not render him disabled. *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).
The proper standard for evaluating pain is codified in the Social Security Disability Benefits
Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not
constitute conclusive evidence of disability. There must be objective medical evidence showing

28

the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders v. Sullivan*, 914 F.2d 614, 618–19 (5th Cir. 1990). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir.1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Homes v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

"It is appropriate for the Court to consider the claimant's daily activities when deciding the claimant's disability status." *Leggett*, 67 F.3d at 565 n. 12. Any "inconsistencies between the [claimant's] testimony about [her] limitations and [her] daily activities were quite relevant in evaluating [her] credibility." *Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir.1990). Here, the ALJ observed the inconsistent statements made by Salazar regarding her ability to perform daily activities.

A review of the decision in this case reflects that the ALJ properly considered both the objective and subjective indicators related to the severity of Salazar's subjective pain. However, having observed Salazar, having listened to her testimony and having reviewed her medical records, the ALJ concluded that Salazar's complaints of pain were not entirely credible. (Tr. 46, 48-52, 55). There is nothing in the record to suggest that the ALJ made improper credibility findings or that the testimony was weighed improperly. The ALJ noted inconsistencies between

Salazar's testimony and her responses to her daily activities with the objective medical evidence, as well as the observations by Dr. Bolte, Dr. Keiser (Tr. 325-328, 329-330, 538, 571-572) and her physical therapist (Tr. 325-328; 329-331). *See Dunbar v. Barhart*, 330 F.3d 670, 672 (5ᵗʰ Cir. 2003) (citing *Wren*, 925 F.2d at 128) (an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record).

Nevertheless, Salazar argues that the ALJ failed to consider the "mind altering affects" of her medications. (Dkt. No. 18 at 2). Salazar's argument has no merit. As evident from the decision, the ALJ considered Salazar's subjective complaints regarding the adverse side effects from her medication. (Tr. 16-17, 48-49, 228, 239, 245). In addition, as supported by the administrative record, Salazar reported that she did not have any side-effects from any medication. (Tr. 222, 261, 305, 313, 324, 362, 529, 768, 796). Although there was evidence before the ALJ that supported Salazar's symptoms of pain and hallucinations, this was due to her non-compliance with medication. (Tr. 15, 17, 19, 22, 25-28, 341-42, 734, 754). A claimant's compliance with treatment is a factor that an ALJ may properly consider when assessing a claimant's subjective complaints. *Villa*, 895 F.2d at 1024.

In conclusion, while the Court has no reason to doubt that Salazar suffers from pain, the mere fact that working may cause a claimant pain or discomfort, as a matter of law, does not mandate a finding of disability. *See Epps v. Harris*, 624 F.2d 1267, 1274 (5ᵗʰ Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C.Cir. 1986). Upon this record, the Court finds no error was committed by the ALJ and that substantial evidence exists in the record to support the ALJ's finding. As a consequence, the Court concludes that this factor weighs in favor of the ALJ's determination.

## D. Educational Background, Work History and Age

The final element considered is the claimant's educational background, work history and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that Salazar was 44-years-old at the time of the administrative hearing, she had obtained her GED, she was able to read and write in English, and that she had past relevant work experience[6] as a hotel clerk/auditor – a job which she worked full-time until she was fired in 2005. (Tr. 28, 45-46). The record reflects that the ALJ properly considered all these factor, thus, this factor weighs in favor of the Commissioner's determination.

Additionally, the ALJ questioned a vocational expert at the hearing about Salazar's ability to engage in gainful work activities. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir.1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir.1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir.1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be

---

[6] The ALJ noted that Salazar "has a very poor work history with only four years of substantial gainful activity in the last 15." (Tr. 28).

31

supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

In this case, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Salazar was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Salazar could not perform her past relevant work (Tr. 28, 57-58), but that she could perform light work with restrictions. (Tr. 28-29, 58). Because the hypothetical questions contained all the functional limitations recognized by the ALJ, the Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Salazar was not disabled within the meaning of the Act and therefore was not entitled to benefits.

Notwithstanding, Salazar maintains that the ALJ's determination is flawed because she is unable to find work. (Dkt. No. 18 at 2). Unfortunately, for Salazar, the fact that she cannot find work does not translate into a finding of disability. On the contrary, a claimant's inability to find work is not factor relevant to the ALJ's inquiry. *See* 20 C.F.R. §§ 404.1566(c), 416.966(c); *see also, Harrell v. Bowen*, 862 F.2d 471, 479 (5th Cir. 1988). Accordingly, this factor weighs in favor of the ALJ's decision.

32

### E. Request to Remand For Consideration of New Evidence

Salazar filed an opposition to the Commissioner's Motion and, in support, included letters from her current treating doctors. (Dkt. No. 18, Attach. A & B). Implicit in Salazar's submission is the request that the Court remand her case to allow the Commissioner to reconsider her disability status in light of "new evidence." (*See id.*). The Commissioner maintains that Salazar's "new evidence" does not warrant remand because the opinions that Salazar is unable to work is reserved for the Commissioner and that these non-retrospective opinions represent Salazar's current condition and, thus, are not material. (Dkt. No. 21 at 2-4).

The Court concludes that the "new evidence" submitted by Salazar does not warrant remand for several reasons. *See Castillo v. Barnhart*, 325 F.3d 550, 553 (5th Cir. 2003) (a court may remand for consideration of new evidence only upon showing by the claimant that (1) there is "new" evidence; (2) the evidence is "material"; and (3) good cause exists for the claimant's failure to present the evidence at the administrative level in a prior proceeding). First, the "new evidence," which are letters from Salazar's new doctors that address Salazar's current condition, are not material because the opinions were rendered almost a year after the ALJ issued the unfavorable decision in this case. *Ripley*, 67 F.3d at 555, n. 14 (evidence is not "material" where it does not relate to the time period for which the benefits were denied <u>or</u> is merely evidence of a deterioration of a previously non-disabling condition when the deterioration occurred after the period for which the benefits were sought); *see also, Jones v. Callahan*, 122 F.3d 1148, 1151-52 (8th Cir. 1997) (upholding district court's decision not to remand because new evidence claimant sought to introduce on remand was not material because "it does not relate to the time period for which the benefits were denied"). Second, the opinions expressed in the letters merely address

33

Salazar's ability to work, which is an issue reserved for the Commissioner. *See Martinez*, 64 F.3d at 176. Finally, as previously discussed, the ALJ considered similar opinions from Salazar's then treating doctors and declined to give them probative weight. *Villalpando v. Astrue*, 320 Fed.Appx. 208, 211 (5th Cir. 2009); *see also, Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (holding that remand was not warranted where there would have been no change in the ultimate finding that plaintiff was not disabled).

## CONCLUSION

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Salazar was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is **RECOMMENDED** that the Defendant's Motion for Summary Judgment (Dkt. No. 12) be **GRANTED**, and the decision of the Commissioner of Social Security be **AFFIRMED**.

The Clerk **SHALL** send a copy of this Report and Recommendation to the Parties who **SHALL** have until **March 21, 2017,** to have written objections, filed pursuant to 28 U.S.C. §636(b)(1)(C). Failure to file written objections within the prescribed time **SHALL** bar the Parties from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this _____ 6th day of March, 2017.

_____
JOHN R. FROESCHNER
UNITED STATES MAGISTRATE JUDGE